0238083. Say that ten times fast. Okay, so we'll hear from Mr. Hicks. Mr. Hicks, are you going to have any work left after this is all finally over? Sadly, Your Honor, yes. Well, I don't think you've got anything to worry about. It looks like it's never going to be over. We're getting there. They call it a settlement, but we're still hearing. It's a court-supervised settlement program. It's the least settled settlement I've ever seen. I'm new on the court. I find these fresh and exciting cases. Well, then, I can't wait to talk about it with you. I find them fresh. Thank you, Your Honor, and may it please the Court. George Hicks for the BP Appellants. By its own admission, the Tampa Bay Performing Arts Center Foundation is going to receive every penny of a $20 million donation that it recorded as revenue. Yeah, but this isn't the West case. This isn't saying I didn't make as much when I got what I wanted in the contract. This is the question of, so, people give donations to an entity every year. They're going to get this $20 million, but might they have gotten another $20 million without the BP oil spill? I think that's what they're talking about. This is not, in my view, maybe my colleagues can disagree, I don't think this is West, where he's talking about one guy with one contract. He can only play basketball for one team at a time, and he's getting exactly what he was supposed to get. I don't think they're saying they didn't get this $20 million because of the oil spill. I think they're saying that goes into the bucket of donations that we then can say was not as much the next year. Well, Your Honor, I think it does have to do with West, but I think there's also a causal element to it as well. Now, I think that West does certainly have application here because what the West court said was that claims can only be brought by those who, quote, experienced losses, and it had to go on to determine what a loss is under the settlement agreement, and it defined a loss as, quote, an unexpected diminution in income that could otherwise support a claim for civil damages, and only claimants who suffer unexpected damages can submit a claim. And I think what we have here is, and I don't think there's really any dispute, that the loss here from 2009 to 2010 was entirely expected because you had a front-loaded $20 million donation in 2009. But that's assuming that the $20 million itself, I mean, this is kind of hard, so we'll just say, like, use checks because dollars are kind of fungible. Checks are not. So they're receiving a check for $20 million. I understand they didn't. It was a commitment or whatever. But a check for $20 million, and your argument is that check didn't somehow get invalidated after the oil spill. That check is still extant. But the argument could be what we were hoping for, check B, another $20 million, and we didn't get it. That's different from West's argument. He can only get one contract at a time unless I'm missing something in basketball. You can only play for one team at a time, I hope. So his argument is a little different. So I'm saying if that is the argument, that check B never materialized from some other donor, why can't that prevail? Well, I think if that is the argument that they're making, and with respect, I'm not sure that it is because they didn't even submit a response to our 28-J letter on West. But going with that argument, I think the response would be, well, then you have to talk about is there any nexus whatsoever between the 2009 front-loaded donation and the happenstance of the spill in 2010 that would somehow then merit a doubling. So West was, you know, a very unusual situation. But we in the West, I was on the West panel, we in the West case could not undo the prior, you know, eight years or whatever it is of cases from our court that says we don't start over again with causation, you know, did the car wreck cause the heart attack or not or whatever. The typical causation trial is not part of this settlement. Instead, you have to do your attestation. And the reason West lost is because the evidence completely refuted any potential causation and undercut his attestation. But here, we kind of don't know. So why isn't this just one of those typical, maybe my restaurant was going down the drain anyway, but after the oil spill I made less money at my restaurant than before, and in a normal case you could have shown that my food was now bad instead of that it was the oil spill, but you're just stuck with the fact that I lost money after the oil spill. Why isn't this like that? Two responses, Your Honor. First of all, I think that what West did in looking at the unusual case where there was no plausible claim for an unexpected loss in income, I will grant you that it was the unusual case, but I will also submit that this is a similarly unusual case precisely because you have this $20 million donation that is a 20-year-long stream of cash, but by virtue of the fact that they are able to record it in 2009 as an unconditional pledge, and just to put a pin in it, we do have some disputes about whether it's actually unconditional, but to assume that it actually is unconditional is the only reason why they are able to put all of that in 2009, and so even at the beginning of 2010, before there's ever any Deepwater Horizon incident whatsoever, it's completely expected that there's going to be a drop in income from $20 million to its historical baseline of a couple hundred thousand, and we know that because when the foundation went to the CSSP in the first instance, it got an award of a couple hundred thousand dollars, and it's only after it went back to the CSSP and said, wait a second, you forgot about our $20 million donation that we received front-loaded in 2009, and that's when the CSSP then said, okay, we're going to give you a $20 million award. So I do think that, and I'm still in the first part of my answer, which is that this was a completely expected decrease in revenue from $20 million to essentially de minimis, which is what the foundation has had throughout. But the second part of my question is that even if you put aside West, you do then run into the question of nexus between the supposed loss and the spill, and this Court has not completely excluded the idea that there are implausible claims. I mean, Judge Haynes, you said in your separate opinion that the sums awarded in that case in West reflect a loss that was not caused by the oil spill, and you charitably called it an implausible case that there was any connection between. Yeah, but I said it should be remanded to be considered, and that wasn't. Well, to be perfectly clear, we are happy with a remand that would either, number one, require the CSSP or the district court to apply West in the first instance, almost like a GVR in light of West, or a remand that basically. And they could conclude that West doesn't apply for the reason I said, that maybe you thought you could get another $20 million, but because of the oil spill nobody had any money anymore? In other words, a GVR assumes that the results could be the same in the end. To be sure. It's just that you're letting the more junior court or the so-called lower court or entity examine it in the first instance. Right. And to be clear, we would be fine with a, if you want to call it a GVR in light of West, which came out after the briefing here and to which there really hasn't been any response by the other side. But also. We'll ask. But also to be clear, we think that, and this is more in line with your separate opinion in West, to have a remand to resolve any other questions about what else could they have gotten in 2010. But without that $20 million in the equation, because it's the expected decrease from that $20 million in 2009 to, you know, essentially nothing of the baseline in 2010. And to be fair, I'm bound by West's majority, whether I agreed with it or not. But West is bound by the prior cases, too. And we have case after case after case that says we ain't starting over again with whether the car wreck caused your heart attack or you just were going to get one anyway. We aren't starting over again with causation about was the restaurant making bad sandwiches or was it the lack of people in New Orleans after the oil spill. And so we have, you know, dozens of cases to that effect. West was just a very extreme example of someone taking advantage of the sort of minimal causation requirement. But I don't think that's opening the door to now every case, we've got to start from scratch, and did it really cause it or were you just a bad restaurant or a bad lawyer or a bad foundation. I don't disagree at all. And we're not asking for the door to be opened. But, you know, two responses. Number one, you used the words taking advantage of. And, you know, with all respect, when you get and are guaranteed a $20 million donation, and the guarantee is exactly what lets you record it in 2009 and then claim another $20 million, you know, I think it comes close to that line. When's the last time they received a $20 million donation? They have never received a $20 million. When's the last time they received a donation that resulted in the foundation being renamed for the donor? Never, Your Honor. This donation was 2,700% of the total donations that they received, I think, in several years following 2010. But the second response I want to make regarding the West, you know, again, fully conceding that it applies to a narrow case of unusual situations, you know, but I will also say that there was a case after West, the Howard Industries case, and Judge Duncan, you were on this panel. And at the very end of that decision, it also talks about, now, it denied a claim there. I will grant you that, but that was because in that case BP had argued that there were other causal factors that went into the decline, market conditions, the recession, et cetera. And at the very end of that decision, the panel recognized that there would be cases where there was suspicion of a nexus or there was the sole superseding cause of the loss. And I think that is exactly what we have here. There is no other basis for the claims loss here other than the fact that this one-time extraordinary donation was front-loaded in 2009, and therefore, on paper, there was an enormous loss from 2009 to 2010, one that was completely known and expected at the beginning of 2010. Let me ask you how the GBR for West would look. We would have to send it back to the district court to say the district court abused its discretion in not granting or to send it back to the district court to reexamine whether to exercise discretion to hear this case in light of West. Which one would we be doing in your GBR approach? Well, I think what you would be doing is you would be sending it back to sort of the status quo ante, which is the district court, you know, then gets to exercise its discretion. However, I think it would still have the option not to. It would have the option not to. And we get that appeal back. And, you know, it might be a better option to simply. You know, how much longer are we going to have this? It is my understanding that there are actually fewer than 100 claims remaining in the CSSP. It seems like they all come to us, and that seems inconsistent with the notion of discretion in the district court, that we keep ending up having to do the work on it. Well, with all respect, Your Honor, these are the last claims because they are the biggest and the most important, and the denominator in these is like hundreds of thousands. And the only reason we're here and I'm here today is for the claims that, you know, with all respect, have the markings of suspicion or where there's a sole superseding cause of the loss. And I think that's what we have here. And in my remaining time. Mr. Hicks, I just want to ask you. We've been talking about West a lot, but there are plenty of other issues. Let's say hypothetically we remanded the district court for reconsideration. There are plenty of other issues that you raised that we could include in such an order hypothetically, right? I mean, just to get down to whether foundation even meets the definition of a class membership, meets the class membership criteria at all. Is that an issue? That was the next issue I was going to get to because I think that that is another way to cleanly dispose of what I, you know, with all respect, think of as a windfall. Who is it that you're respecting all the time? The three of you and opposing counsel. But, you know, the respect that you have to hear these appeals as well. They say you waived that issue. What's your response to that, if I understand their argument? Sure. Our response is that falling outside class membership is a jurisdictional defect. This entire settlement program, it is the court-supervised settlement program. It's under the district court's jurisdiction. And if I point you to Record 24879, this is Section 4.3.2 of the settlement agreement, the court shall retain ongoing and exclusive jurisdiction over the settlement program. The claims administrator is appointed by the court. And the even more important section, 18.1, and this is at Record 2268, the court shall retain continuing and exclusive jurisdiction over the administration and enforcement of the agreement and the distribution of its benefits to economic class members. So therefore, an entity can file a claim and obtain an award only because of the district court's jurisdiction. And if an entity is outside the class, it cannot invoke the jurisdiction of the district court either by filing a claim with the court-supervised settlement program or obtaining an award. So if an entity is not a class member, the district court has no jurisdiction to, quote, administer the distribution of benefits under Section 18.1. So whether a claimant is a member of the class and can obtain an award, we think, is a jurisdictional question that can't be waived. And here, just to impress upon it, there's, I don't think, any real argument that they are not a member of the class. The only way that they try to claim a member of the class is by saying that they have full-time employees, which is one of the requirements. But in literally the same form in which they claim, they point to, they also say that they tell the IRS they, quote, have no full-time employees. And if you look at the table that they point to, you know, there's no contradiction, because there's nothing in that table as we explain in our brief that explains why they have any full-time employees. So it's completely consistent. They don't have any full-time employees. And they have to be paid employees? A full-time employee has to be paid? Well, all the settlement agreement says one or more full-time employees. I don't think we have to get into what's an employee, what's not, because, you know. Because you understand that foundations can have volunteer employees that, frankly, work more hours than those of us who are paid. Sure. I understand that there are volunteers. And that would qualify as a full-time employee or no? Well. If you had, say, a director of programs who was a retired lawyer who had plenty of money and was just doing this because they cared about the foundation, and they weren't being paid but they came in every day, wore a suit, worked on their computer, did a bunch of stuff 40 hours a week, would that be a full-time employee? I don't know if someone who doesn't receive any compensation from the entity would count as a full-time employee, just under what we think of as employee. But, you know, certainly they haven't pointed to anyone like that in their evidence. Thank you. Okay. Ms. Lopez. May it please the Court, Lindsay Lopez on behalf of the claimant. I'm just going to start with what was the main thrust of the argument before. This case is not the West case. Why not? And why didn't you respond to the 20HA? Well, under the rules it said that we're entitled to respond, but I felt like the West case was sufficiently different that I'd be able to address it on oral argument. I didn't want to waste the Court's time with additional files. This case is not the West case, most importantly because West was limited to what he could receive under the contract. He had a contract that required him to play basketball for the Hornets. As a result, he couldn't go play for someone else. And the contract set forth exactly what he would receive in the years that followed. There is nothing, there is no contract that would prevent us from getting a similar donation in the post-spill period. So you are agreeing with my check A and check B analysis. Absolutely. We're not talking about not getting this $20 million. We're talking about the next guy that shows up with a checkbook for $20 million. Absolutely. And there's another important distinction with West, which is that West was a Zone A claimant, so they didn't have to do an independent causation analysis. We're a Zone C claimant, so we did have to separately establish causation under Exhibit 4B. So there's additional indicia of reliability in our case, but there's nothing, there's no reason that the Foundation couldn't have received in the post-spill period a very similar donation from someone else. It is a large donation. But what evidence is there that with no oil spill they got the first $20 million? With an oil spill, what evidence is there that, let me back up, what evidence is there that this kind of donation ever showed up at this place except this one happenstance of right before the oil spill? Well, first of all, this is a factual issue that the claims administrator or the settlement program actually dealt with. They heard BP's argument that said this is sort of an atypical type of donation, and they said we don't find that supported by the record because of the nature of nonprofits. There's a lot of work that goes into getting donations, and so we have actually a full-time director of planned giving 40 hours a week. It's reflected in the tax returns. Who pays that person? Ultimately, we pay that person. The payment comes initially through the center, and then you can see throughout the record evidence that we are ultimately responsible for paying that person. Who is we? The Foundation. Tell me how that works physically. I'm the director of planned giving. I get a check every week or two weeks. Whose name is on the check? I believe it's the center saying it's on the check. Okay. And then how does that become the Foundation's money? There is an administrative services agreement. I'm going to tell you where it is in the record. Give me just a moment. You also look at the administrative services agreement is in the record several times, including 1977. You can also look at the unsworn declaration of Mary Beth Rossi from the Foundation, and that's in the record at 554. It sort of explains the process of the reimbursement, and this is also backed up by the financial data that's in the record because there's some questions that went back and forth between council and the settlement program, asking questions about the payroll and why it fluctuated over time. So there is payroll information that was submitted in connection with this claim. You can look at record 1210 to 1211 and record 1310, which is some correspondence going back and forth that talks about. . . What I'm trying to understand is this. Let's say I'm making, I'll just make up a number, $1,000 a week. The center issues my check. I get the $1,000. Does then the Foundation have to pay the center the $1,000? Yes. So you're saying that the center is just operating as kind of the HR department, if you will, because they know how to issue checks and the Foundation doesn't, but the Foundation has to pay that $1,000. Whether or not they want to give anything else to the center, they've got to give them the $1,000 for me, the director. Right. We have to reimburse. It's an arm's length transaction. We have an administrative services agreement, and we are ultimately responsible for reimbursing the center for any costs that they pay on behalf of the Foundation. Okay. The argument that you appear to be making now, which is the nature of your loss, is that somebody else might cut you a check for $20 million but for the oil spill. That appears to be what you're saying. Does that assume that a $20 million donation like that is revenue typically earned? Yes. Well, it assumes it's the type of revenue typically earned. Is it yes, the type of revenue typically earned? Donations are exactly the type of revenue that we typically earn. So we don't have to pay any attention at all to the fact that you've never gotten a $20 million donation ever. It doesn't mean it's not typical and that when you got this donation, you renamed the Foundation after the donor. Are you going to rename the next $20 million donation after the next donor? I don't know the answer on the naming rights, but I can tell you that, first of all, this was a factual determination that the settlement program made. BP argued that this is atypical, and the settlement program said, based on the record before me, I don't find this atypical because nonprofits don't receive regular revenue the way other corporations might. It doesn't mean we couldn't have received it in the post-spill period, but the fact that there's not a regular pattern that you can look at, he said it was not atypical, that donations like this are typical for nonprofits. And it is possible to accumulate $20 million in contributions in the aggregate without a single donor giving $20 million. Absolutely. It's possible. And I will tell you that there are other significant— Has that ever happened in the history of the Foundation? It's not in the record, not that I'm aware of. And there are other— What you say, I mean, this whole director of planned giving, planned giving is exactly that. People put it in their will and die, and suddenly you get all this money. People, they do a capital campaign and start jumping on the people that have supported them in the past with smaller amounts and try to get the bigger amounts, and you don't know when that's going to materialize. But I guess the problem is if we loosely are still feeling like all of this has to be sort of a— I mean, my understanding in West and the other cases is it's sort of a substitute for the normal proof of causation, but it still has to kind of harken back to the notion that the oil spill had something to do with it. So we would have to conclude that all these rich donors who might have been writing million-dollar checks, 20 of them, are now so upset and affected by the oil spill that they no longer are interested in doing that. I think nonprofits are especially vulnerable to things like that, to changes in the market like this, because people don't have extra income to give to nonprofits. So nonprofits may suffer more in a time when the economy is down in the Gulf Coast area because of the oil spill, because that's something you do after you meet your basic needs. It's not like businesses that have to pay certain bills or that have certain things. This is something that happens after you've already paid for everything that you can, and so they're particularly vulnerable in this time. Does the Foundation have any full-time employees? Well, during this period, during the relevant period, yes. Between April 2010 and April 2012, which is the period to be looking at, we did have Bill Fossett, who was the director of planned giving. So when I look at Record 1883 that says the Foundation has no full-time employees, how do I square that with your answer? Sure, that relates back to a different page on the tax return. It talks about how certain things are reported, and as we discussed earlier, the center pays the payroll for the employee, but the Foundation is responsible for reimbursing him, and he works full-time 40 hours a week for the Foundation. So why not say that? Why is the tax return reflecting no one? Well, it's the same tax return that also shows that he works 40 hours a week for the Foundation. It relates to the particular section. It goes on to say key personnel in support of the Foundation are center employees. For payroll purposes, they're center employees. Is that also true with respect to Mr. Fossett? As far as 2010, if that's the tax return we're looking at, yes. Well, it's 1883. Yes. So for 2010 and 2011, he was actually outside the record, but it's another reason that it's significant that this issue wasn't raised below because we weren't able to develop a full record on this below. I understand that that actually changes in 2012, and that's really actually very significant for this Court's analysis. When do you have to satisfy the criteria for class membership? Sometime between for this full-time employee, this class definition, it says you have to have a full-time employee, I believe it's sometime between April 2010 and April 2012, at any time during that period. And so this statement of the tax return is certainly not dispositive of that issue. Well, it's certainly evidence that their Foundation has no full-time employees. That year. Where's the countervailing evidence? Beg your pardon? Where's the countervailing evidence that shows that it does have a full-time employee? Well, it's the fact that we show on that same document that Bill Fossett worked 40 hours a week exclusively for the Foundation. In the same document? In the same document. That I'm reading from? I'm just trying to understand. It's several pages back in the Form 990. So this tax return is in the record a number of times, as I'm sure you're aware, and so my record numbers that I have here are going to be a little different than the actual document you're looking at. But you're basing the evidence that you're saying that shows Mr. Fossett is a full-time employee of the Foundation as in the same document? Yes. That says the Foundation has no full-time employees and that any employees are center employees. Yes. It's the same document that shows that he works 40 hours a week for the Foundation, and we also have the records of the unsworn declaration of Mary Beth Rossi, and that only covers 2010. And so it is significant. It's very significant that they didn't raise this issue below. We are hearing this issue about... You say it's jurisdictional. Is it not? It's not jurisdictional. Why not? It's just not jurisdictional, and they haven't cited any authority for the fact that a discretionary determination regarding whether someone is part of the settlement class is jurisdictional. We invoked the jurisdiction by filing a claim. This Court discussed jurisdiction in sort of Article III standing in the Deepwater Horizon case at 739 Federal 3rd 790, and that discusses the fact that you need an injury in fact, traceability to the defendant's conduct, and the potential for the injury to be redressed through the relief requested. That sounds like a constitutional standing requirement. Well, that's how you get to the jurisdictional standing issue here, and you invoke that and you satisfy that through pleading it. And so by filing a claim... But if it is, I'm not understanding. If it is jurisdictional, then we could address it now, couldn't we? It's not jurisdictional. This is not a jurisdictional issue because we would have invoked the jurisdiction by filing the claim. At that point, the settlement program makes the award, and then they have obligations under the settlement agreement that if they have any problems with the award, anything that they think that we don't qualify as a class member because we don't have sufficient damages, anything that suggests that we're not a class member because we fall outside the geographical area, they raise it then. And that's the time that they have to raise it. And then only what they raise then do they get to raise to the district court, and only what they raise to the district court do they get to raise here. I'm looking at Form 990, page 1858 of the record, and it says, Bill Fawcett, Director of Endowment and Giving, 40 hours for related organizations, and then E, reportable compensation from related organizations, and it has his salary, which I won't say out loud. And that's it. Under D, reportable compensation from the organization, it's 0, 0, 0, 0, 0. But there is a figure higher than zero for Mary Beth Rossi, Lauren Shepard, and Bill Fawcett. Under E, reportable compensation from related organizations. Right, and this is consistent with the fact that the compensation was paid through the center, and I agree with that, but he worked full time for the foundation. This relates to the geographical. But is this the same form that I was reading from earlier at 1883 that said the foundation has no full time employees and key foundation personnel are actually center employees? I'm just asking if it's the same document. I believe it's the same form because it's in here so many times and there's so many different tax returns, but I believe it is the same form. And you say this is 2010. This is the 990 from 2010, right? This is from 2010. You said there's evidence. I thought you said there's evidence that this changed and that Mr. Fawcett actually became an employee of the foundation. So what I'm saying is that the record's not developed on this point. I think it does change, but it changes in a period that's outside the record, and that's the reason that it's very significant that they didn't raise it. All right, so why not do the GVR? That sounds like everybody then gets another shot at really developing the record and that's the better place to be. Send it back to Judge Barbier to look at, hey, now we have West. We have some more explanation about how to handle these cases. You can then, if he sends you back to the settlement administrator, you can put on this evidence to show that Fawcett became an employee and all of that. So why not do that?  The standard we're here on today is whether Judge Barbier abused his discretion. To the extent we're talking about whether or not the center has or the foundation has full-time employees and whether or not they qualify under the class definition, that issue wasn't even raised to Judge Barbier. He couldn't have abused his discretion. So unless it's jurisdictional, you're saying we should even consider it. It's out. It's out. It's never been raised. It's been waived. And it's not just the normal procedures. The normal sort of appellate court shouldn't consider whether it raised to the district court. There's multiple levels of it here. And for Article III standing, I don't think the settlement can define that. They can't decide whether we have Article III jurisdiction. I think the settlement can define who's a class member, but I think if there's a debate over that, then the court has jurisdiction to decide that. Right? Yes, I think so. Okay. So if there's a dispute about whether you all really are a class member because of blah, bitty, blah, bitty, blah, that dispute is something that the court can address. So we have jurisdiction, we, the federal courts, over that. Then if we conclude the person is lax standing, well then, of course, they leave. But the question of the class membership needs to be addressed. And you're saying it never was because they never raised it. They never raised it. They never raised it below. And we aren't the people really well equipped to decide these facts. A bunch of appellate judges, we don't really generally decide facts. We decide whether the evidence supports something. Yes, so facts matter a lot. We aren't usually the ones saying, you look like you're telling the truth and you don't. And there are additional reasons in this case that there's really been a waiver because the rules governing the right to discretionary review, for example, say that the district court can't address something that wasn't raised to the appeal panel. There are rules under the appellate rules that say that you have to raise all of your issues and your notice of the BP has to raise all the issues that it intends to appeal in its notice of appeal. So for it to show up at this late time, it's waived. Well, on to something that seems pretty clearly, well, at least sort of a legal issue. I mean, whether this foundation is a pass-through entity or not. Do you disagree that there's an appeal panel split on how we assess whether an organization is a pass-through? Sure, I do disagree that there's a split. You disagree there's a split. I disagree there is no split. Those cases turn on their facts. They address different facts. And under those different facts. But we have to know a framework for assessing the facts of whether there's something that's a pass-through entity or not. I mean, this looks like it at least has some, partakes of some elements of a pass-through entity to serve the center. Well, this issue was actually really recently addressed by this court in March of this year on another large non-profit claim, a $15 million non-profit claim. And what this court said in that case is it's not an abuse of discretion for the district court to defer to the settlement program's determination on that. That's not an abuse of discretion. So in this case, the settlement program looked at everything. It looked at all the arguments that BP made and it said Do you have a cite for that? Yes, I do. This is at record 247. And it said in the instant appeal, the record does not support the claim it was merely a pass-through entity. Claimant accepts donations from which it pays expenses, makes investments, maintains a cash surplus, and makes charitable distributions. Further, claimant's annual tax returns do not zero out every year as one would expect if claimant were simply a flow-through entity. So this was a fact-bound administrative decision. I understand your argument, but we had a similar quote-unquote fact-bound argument over what constitutes fixed versus variable expenses. And yet we have decided in a fairly recent case that, you know, the appeals panel wasn't looking at this the right way and would need to send it back for reconsideration. There is no appeal panel decision that considers an entity that does activities like this and finds that it is a pass-through entity. All of those entities were – there are, I think, three appeal panel decisions that were cited. They involve the receipt of a set amount of funds that was designated or for a particular need, and then it almost immediately flowing out penny for penny. That is not what we have here. We have a separate spending policy, separate investment policies. We seek to grow our endowment, which is one of the very important things that this court looked at in the first nonprofit decision in 2015. But that's a business activity. That's not a flow-through activity. That's a business activity for a nonprofit. And so the record in this case supports the discretionary administrative decision. Would the foundation be able to turn the money over that they get from their donors to any entity other than the Tampa Bay Performing Arts Center? Maybe. And that is actually cited in our briefs. There is some language in it that under appropriate circumstances they can actually change the beneficiary. Has it ever done that? I don't believe so. But it could. It has discretion. This is not – That would be – it's not like they can say, well, we'd also like to support the St. Petersburg Performing Arts Center and the Tampa Bay. They would have to actually switch and say, Tampa Bay, we're done with you, we're going to go to St. Petersburg. Yes, I think that's correct. They can only really support one entity, but they could have changed the entity if Tampa Bay did something wrong and they decided to go to St. Petersburg. It didn't qualify. It didn't qualify. But even if they just support the Performing Arts Center, it doesn't change the fact that they have separate activity related to trying to grow their endowment. They have an investment policy that balances growth versus making annual distributions, and so they really have discretion with these funds. Even though they ultimately are to support the Performing Arts Center, it doesn't mean that they're not their own entity with their own business revenue. Okay, thank you. We have your argument. Mr. Hicks, you have five minutes for rebuttal. Thank you, Your Honor. I assume you disagree that there's no appeal split with respect to the criteria for serenity? We do disagree, Your Honor, for all the reasons we set forth on our briefing, and I won't go through those here today. But I do think that the past, whether or not this is a pass-through entity here, given that it is in its own bylaws that it must give every penny to the center. In fact, I think it's also in the bylaws that it is literally unable, it is prohibited from giving it to any other entity is significant. What about this thing she just read about they could change, they could go from Tampa Bay to St. Petersburg? Yeah, there's one provision that says that in the event that the Tampa Bay Performing Arts Center decides it no longer wants to be a public charity and give up the business of putting on performing arts, that there can be a substitute entity that also has to be the entity of the pass-through. So it doesn't actually change the pass-through nature of the foundation. It just passes it through to a new entity. So just a few points in rebuttal. First of all, there still hasn't been any statement that the loss here from 2009 to 2010 was unexpected or that there was any connection to the spill that would satisfy this Court's cases that are admittedly, it's a small window, but as Judge Haynes, as you said, there has to be at least a little something there. Great legal standard, the little something standard. A scintilla of causation. Two scintillas of causation. Well, it is a settlement agreement that is in respect to the deep water horizon. I get that, and we had that original case that kind of said, you know, for Article III purposes it's got to be two scintillas, and we didn't use that language. Right, and that's really what the attestation requirement is kind of doing. It's squaring the circle and making sure that there is a loss caused by the spill to some minimal degree, and still I don't think that we have seen that here today. What about the general notion that after such a devastating impact, people stop, you know, they kind of hone in, they start just focusing on making sure their kids can go to college, making sure they've got, they're paying their electricity, working on their mortgage, and not writing big checks to charities anymore? Well, Your Honor, first of all, I think that we're talking about the difference between a $20 million check and all other checks. I mean, there were still checks written in 2010, so it's not as if it completely dried up. So what we're talking about here, because it's the sole driver of this. There's still a loss even without the $20 million, right? Sure. Yeah, and as the CSSP found in the first instance, there was a couple hundred thousand dollar loss. You know, we did not dispute that. It's only when this one-time $20 million donation came into the picture that, you know, is the sole driver of this award. And so, you know, the question here is not whether there were other causal factors that might have affected other donations. It's this one-time donation, again, to use the language from the panel that Judge Duncan sent, the sole superseding cause. So, you know, I still think we haven't seen that here today. The second point is to go to the class membership requirement. I mean, to have standing in order to bring a claim at all, you have to have injury. And there's no injury if you're not in the settlement class. And, of course, this — But to bring that up, I mean, this is a weird hybrid because, frankly, you don't need Article III standing to go to a contractually-based settlement committee. You have to have it to go to the federal court. And so we've got this bizarre scenario that's been replete throughout the BP cases. And, frankly, we could reexamine whether we should have even started down this path, but that's water under the bridge, so to speak. You have this situation here where challenging the class membership, I think, is something we have jurisdiction to decide. And so don't you have to raise that in the district court? If you're going to say the district court abuses discretion, refusing to hear you, you have to have at least told them what they needed to hear. Well, I think this court has jurisdiction to decide if there's jurisdiction. And so if— But if we don't know, there's a dispute about whether they're a class member. They're saying, well, we didn't get to put on all our evidence. You're saying, la, la, la, la, la. That doesn't strike me as something we get to decide, well, the district court abused its discretion to not hear an issue it didn't know about. My first response is I don't think there's any realistic dispute over the full-time employees. And I think they say it in the exact same form to the IRS that they have no full-time employees, and that is literally the exact same language that the settlement agreement requires. One or more full-time employees, they say the exact opposite. But does the settlement agreement define it the same way as the IRS? Define the phrase full-time employee the same way the IRS does? I don't have the answer to that. But, you know, but the fact— That's the problem with us deciding stuff like that. I mean— Sure. And just the last point I do want to make, if I may, is just that, you know, we also don't know whether this 2009 donation, which was only able to be recorded in 2009 because it's unconditional, you know, we don't even have the full pledge agreement because the appendix is not—was never submitted. And that appendix itself, according to the pledge, contains, quote, details regarding the gift and its payment. And if there's even one detail in that missing appendix that renders this donation conditional in any respect, then none of this could have been recorded in 2009, and the entire thing goes away as well. Okay. Thank you very much. We have your argument, and that concludes the cases for today. We will resume argument tomorrow morning at 9 a.m. Thank you.